## Chreste v. Commonwealth.

(Decided June 16, 1916.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, First Division).

1. Attorney and Client—Disbarment Proceedings—New Trial.—
Where an attorney, in response to rules charging the commission

of offenses that authorized his suspension or disbarment, admitted his guilt and was at once permanently disbarred, he should have a new trial if the circumstances connected with the filing of the response and confession of guilt are such as to show that he did not fully appreciate or understand the consequences of what he was doing.

2. Attorney and Client—Suspension or Disbarment—Ground for.— Where an attorney, who was not connected with a pending case, learned of a material witness for the plaintiff of whose whereabouts the plaintiff was ignorant, and refused to discover the witness until he was employed in the case, he was guilty of such unprofessional conduct as to warrant the issual of a rule for misconduct.

3. Attorney and Client—Personal Solicitation of Business.—The personal solicitation of business by an attorney does not constitute sufficient grounds for suspending or disbarring him, in the absence of a statute.

4. Attorney and Client—Solicitation of Business Through Non-Professional Agents.—An attorney who employs, for a stipulated consideration or a contingent fee, agents or runners to secure business for him is guilty of such unprofessional conduct as to warrant his suspension or disbarment.

5. Attorney and Client—Suspension or Disbarment—Procurement of False Testimony.—An attorney who is guilty of procuring false testimony in a case commits an offense that warrants his suspension or disbarment.

6. Attorney and Client—Power of Courts to Regulate Conduct of Attorneys.—Courts independent of statutes possess the inherent right to control and regulate the official conduct of their officers, such as attorneys, and to inflict upon them punishment for official misconduct.

THUM & ROY for appellant.

A. SCOTT BULLITT, ELMER C. UNDERWOOD and HUGH B. FLEECE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant, Chreste, a practicing lawyer in the city of Louisville, prosecutes this appeal from an order made by Judge William H. Field, of the Jefferson circuit court, disbarring him from the practice of law.

A full understanding of the nature of the case and the grounds relied on for reversal make necessary an extended statement of matter that appears in the record.

Four rules, based on different grounds, supported by information, were issued by Judge Field upon his own

motion on December 1, 1914, against Chreste to show cause, if any he had, why his name should not be stricken from the roll of attorneys. These rules, and each of them, were made returnable on December 4, 1914, and were executed on Chreste on the day of their issual.

Rule number one, as we will style it, charged that on April 3, 1912, "There came on for trial in said court, common pleas branch, first division, the case of Mary E. App v. Louisville Ry. Co., in which it was testified that plaintiff, Mrs. Mary E. App, having been thrown from a street railway car, was assisted by an unknown person; that said trial resulted in a verdict for defendant; that upon a motion for a new trial it appeared that said unknown person had been discovered and that his testimony would be material, whereupon a new trial was granted plaintiff and upon the second trial, said unknown person, Thomas Curley, testified on behalf of plaintiff; that shortly after the accident to Mary E. App, defendant learned from said Thomas Curley that he, Curley, had seen the accident; that defendant, Chreste, was present in the court-room during the first trial of the case and saw that said Curley was not present as a witness; that at the conclusion of the trial defendant told counsel for Mary E. App that he knew the unknown person who was said to have assisted Mrs. App; that defendant agreed to produce said witness for a consideration, and counsel for Mary E. App promised to allow him a percentage of their contingent fee if defendant produced said witness; that on the second trial the witness, Curley, appeared and testified in behalf of Mrs. App, who won a verdict; that defendant, Chreste, knew of testimony material to a litigant and suppressed and withheld the same and divulged it only upon the condition of his being employed in the case and receiving a fee." This rule was supported by a transcript of the evidence in the case of Mary E. App v. Louisville Ry. Co.

Rule number two charged that "in January, 1913, Chreste employed L. C. Sherrick to secure his employment as an attorney, agreeing to pay said Sherrick as compensation therefor the sum of $25.00 per month, his carfare expended, and 25% of the fee of defendant in each case secured for him by said Sherrick; that said Sherrick worked for Chreste for some three months

under said contract of employment." And this rule was supported by the evidence of L. C. Sherrick.

Rule number three charged that "on or about November 30, 1913, he employed one, Clarence Saunders, to solicit the employment of said Chreste by persons who had been injured, said Chreste agreeing to pay and paying him $8.00 per week to give and giving him an unlimited expense account; that Saunders remained in Chreste's service until on or about November 9, 1914; that during the period between the two dates mentioned, Saunders solicited and secured the employment of Chreste in many cases; that Chreste instructed Saunders to say in soliciting employment from persons of the Catholic religion and from persons of Irish descent that he represented Messrs. O'Doherty and Yonts, and to say in other cases that he represented Messrs. Edwards, Ogden & Peak; that Saunders followed the directions of Chreste in these particulars." And this rule was supported by the affidavit of Clarence Saunders.

Rule number four charged that "on Friday, November 20, 1914, upon an affidavit of Edward Moran that Clarence Saunders had stated to him that he, Saunders, and defendant Chreste, who was and is an attorney at law practicing at the bar of the Jefferson circuit court, had procured two witnesses to give false testimony in the case of Clara Schipper v. Louisville Ry. Co.; tried in the aforementioned division, a rule, returnable November 24, 1914, was issued against Clarence Saunders to show why he should not be proceeded against for contempt, if the statement attributed to him was false; that on November 23, 1914, while the rule was in the hands of the sheriff of Jefferson county for service, defendant Robert A. Chreste, in said Chreste's office, threatened Saunders, telling him that if he swore that the statement attributed to him in the affidavit of said Moran was true, he, Chreste, would use the money which was due him, under his employment by Chreste, to send him to the penitentiary; that he, Chreste, with the connection he had and the money he had could put an innocent man in the penitentiary and get a guilty one out; that defendant, Chreste, told Saunders that if he denied the statements attributed to him he would be paid all that was due him; that Saunders was thereby led to avoid the service of the process of the court; that the rule was returned by the sheriff on November 24,

1914, endorsed, 'Not found;' that upon the affidavit of J. A. Beckley, deputy sheriff, that Saunders was avoiding service, an attachment was issued for him, returnable November 30, 1914; that said attachment was returned on said date endorsed 'Not found.' "

The next order appearing in the record was made on December 4, 1914, and reads as follows: "This day came the defendant in the above styled four cases and filed herein his verified response and thereupon moved the court to submit the above styled actions for judgment, and it is thereupon ordered by the court that the defendant's said motion to submit the above styled actions for judgment be and the same is sustained; and said actions were thereupon submitted for judgment upon the pleadings, exhibits and the verified response of the defendant.

"And the court being advised, it is considered and adjudged that the response of the defendant in each of the above styled actions be and the same is hereby adjudged to be insufficient."

The response of Chreste mentioned in this order and filed on December 4th, reads as follows: "In response to the four rules that have been issued against me by Honorable Judge Field, will say that I am not accused of ever having wronged any client; but am accused by two dissatisfied former employes who will admit that they are dissatisfied over money matters; and also with having withheld information about a valuable witness in the case of Mary E. App v. Louisville Ry. Co. until I was employed in the case by the original counsel who had lost the case.

"In rule number two will say that while I did not employ L. C. Sherrick to solicit business for me during the three months that he claims to have been working for me, he did occupy desk room in my office, but was engaged in a different business. During this time I did loan him about $150.00 which he never paid back, and yet he still claims that I owe him money. He claims to have worked for me three months, and yet only claims to have secured one case for me during the entire time.

"In rule number three I did employ Clarence Saunders upon a weekly salary and gave him an unlimited expense account to solicit business for me; but never authorized or instructed him to refer to me as judge or to represent the law firms of O'Doherty & Yonts or

Edwards, Ogden & Peak, or any lawyer other than myself. I feel perfectly satisfied that every member of the law firms of Edwards, Ogden & Peak and O'Doherty & Yonts will state if they are called upon that I have dealt with each firm for a number of years and that I have been fair and honest in all my dealings and that they know me as a man to be above the accusations that dissatisfied former employes have made against me.

"In rule number four where it is claimed that I threatened Clarence Saunders with prosecution and thereby led him to avoid the process of the court concerning the alleged statement that Clarence Saunders had made to Ed Moran, of the Louisville Ry. Co., that two women witnesses in the case of Clara Schipper v. Louisville Ry. Co. had been procured to testify falsely; will say that I had no reason to keep him away from Judge Field in regard to the investigation of this matter; because the two women witnesses who had been accused, as soon as they saw the accusations against them in the newspapers, went immediately and voluntarily to Judge Field's office and denied the accusation. As far as my threats to prosecute Clarence Saunders are concerned, will say that I told him that I would prosecute him only in the case his accusations were untrue. I asked him repeatedly to go over to Judge Field and tell the truth concerning the Schipper matter.

"In rule number one, where I am accused of withhoding information concerning a valuable witness in the case of Mary E. App v. Louisville Ry. Co. and refused to divulge this information until I was employed in the case after it had been lost on the first trial, will say that I never knew any of the App family until I was employed in the case after it had been lost on the first trial. On the day that the App case was first tried I did not know that the App case was on trial; that I did not come into the court-room where the App case was on trial until the attorneys for the plaintiff had closed their case, and, in fact, did not know that the case in which I was hearing the testimony introduced by the defendant, Louisville Ry. Co., was in the App case until I heard attorney Delos Rogers making the closing argument for the plaintiff and heard him speak impressively about a missing witness. Then after the jury returned their verdict I made inquiry from Mr. Mapother, who was also one of the plaintiff's counsel, and found out that the witness

whom I knew about had not testified. I then told plaintiff's counsel that I would divulge information that might prove valuable to them if I were employed in the case.

"They agreed to give me 25% of their fee in consideration of furnishing the missing witness and doing whatever else I did in connection with this case. There has never been any question but what the testimony of the witness whom I introduced told the truth and nothing else but the truth. The witness whom I furnished was at that time working for some railroad company and I spent several days trying to locate him in different parts of Louisville. I finally located him in South Louisville and then went out to his home and talked with him fully concerning the facts in the App case, for while I knew that this witness had seen the accident, I had never talked with him fully concerning the facts up to this time. I then arranged to take him down to the App family at 32nd and Grant to have the App family identify him. I made several trips to the home of the Apps and Mrs. App made several trips to my office, and at all of these times I gave her advice and information concerning her case. I myself testified on the second trial of the App case as to how I came in possession of the information that I divulged. The second trial resulted in a verdict for $1,200.00 and was affirmed by the Court of Appeals, and I certainly felt that I was entitled to a contingent fee of $150.00 which I received in this case.

"There has been no desire on my part to commit unprofessional conduct in any of these matters, and in doing what I have done in these matters, I did only what I thought older lawyers have done and were doing by a long established precedent.

"Without further denial, explanation or comment, I respectfully submit the matter to your Honor's judgment. Robert A. Chreste. Subscribed and sworn to before me this 4th day of December, 1914. Louis Summers, Clerk."

And the judgment of the court thereon, which was entered on December 4th, is as follows: "It is therefore considered and adjudged by the court that the right, license and authority of the defendant, Robert A. Chreste, to practice as attorney or counsellor at law in any of the courts of the Commonwealth of Kentucky be and the same is hereby revoked and said defendant is

now hereby forever disbarred as an attorney or counsellor at law in the Commonwealth of Kentucky.''

The next order appearing is on December 7th, when Chreste filed a motion and grounds for a new trial supported by his affidavit, in which he set up ''that the court erred in submitting the action in chief without a response to said rule having been filed on account of the misunderstanding of this defendant, as appears by his affidavit filed in support of ground number two, which affidavit is also in support of this ground, by which irregularity this defendant was prevented from having a fair trial.''

''Because of the. surprise of this defendant which ordinary prudence could not have guarded against, in that this defendant believed he was filing with the court a statement to be considered by the court and counsel · for the Commonwealth in determining the period of suspension of this defendant. The affidavit filed with this motion is in support of this ground.''

The affidavit of Chreste accompanying the motion for a new trial was as follows: ''Affiant, Robert A. Chreste, says that on November 30, 1914, between the hours of 4:30 and 5:00 p. m. in his office on the tenth floor of the Inter-Southern building, he was sought out by Clarence Saunders and his brother, Frank Saunders, and said parties maliciously and violently assaulted this affiant and severely beat him and injured him, and that as a result of said injuries he was compelled immediately to place himself in the care of a physician; that on the day following, to-wit, on December 1, 1914, while this affiant was still suffering mentally and physically from said assault, the rule in the above styled cause was issued against this affiant; that by reason of his said mental and physical condition and for the further reason that in said fight following the assault aforesaid, the glass doors and glass partitions in affiant's office had been broken and the furniture broken and his entire office disarranged and put in confusion and on account of repeated threats over the telephone to kill this affiant or severely injure him, this affiant was unable to devote his time and attention and concentrate his mind upon the preparation of a response to said rule; that on account of the fact aforesaid he was in a highly excited and nervous condition during the several days following said assault and said threats so that he was not able

to prepare or in condition to advise with any attorney, who might prepare his response to said rule.

"Affiant says further that his condition was such that he was not able to sustain and meet the responsibility of making response to said rule at the time the same was due, and that on Thursday, December 3, 1914, about the hour of three p. m. he went to the office of the judge of this court, to-wit: Judge Field, with the intention of advising said judge of his mental and physical condition brought about by the circumstances hereinbefore set out, of which he had already advised the judge the morning after said assault; that this affiant told the judge of this court that he came to him to get his advice about those rules that had been issued against this affiant, and told said judge that he was still suffering from the effects of the injury inflicted upon him on the Monday night previous, and told him further that he was still under the doctor's care on account of said injuries. And this affiant again told the court about the threats against his life and of the condition in his office, and advised the court that he had no opportunity to prepare a response or to go to any attorney, and told the court that he was not able to prepare his response himself, and this affiant told the court that he had never drawn a response to a rule of any kind, and did not know how to prepare a response to the rule issued against him, and that he had come to see Judge Field to know what he ought to do.

"This affiant says further that his mental and physical condition, by reason of the facts hereinbefore set out, was such that at that time he was not able to consider the situation logically or intelligently; that by reason of this condition he did not know where to turn and went to Judge Field for advice in the matter.

"This affiant says that Judge Field treated him with consideration and kindness and addressed him saying: 'Bob, I neglected to tell you that I wanted you to be ready with that response to-morrow. I told all the others (others referred to other lawyers who had had rules issued against them) but I neglected to tell you. Perhaps I should have said something to you about it before this.' The Judge then told this affiant that a response was very easy to draw and that he thought affiant would be able to do it all right. This affiant further says that the following conversation, in substance, oc-

curred. I said, 'Judge, I don't know how. All I can do is to give you an explanation of the facts concerning each of the four rules that have been issued against me, and then you can advise me as to how to draw the response.' Judge Field then said that he would call Mr. Graham, the official stenographer, and that he, (Judge Field) would draw the response for me himself if I would relate the facts. I replied that I did not want to put either him or Mr. Graham to that trouble; that if he would give me some blank paper I would prepare a brief statement of what I had to say concerning each of the four rules. Judge Field then said that it would not even be necessary to mention each of the rules separately; that I could simply make a short statement that would cover in substance all four rules, or could respond to each one separately, just as I liked.

"We talked at length concerning how much better A. P. did by throwing himself on the mercy of the court as compared to J. L. who tried out his case before a jury, and was disbarred, whereas A. P. had only been suspended, and discussed generally the uncertainties of a jury trial. (Initials are used in reference to attorneys against whom rules had previously been issued to avoid embarrassment to them by placing their names in the record.)

"I then said to the judge, 'Now if I prepare a brief statement explaining matters concerning each of the four rules that have been issued against me, what sort of punishment will I receive?' Affiant then understood the Judge to reply, 'Bob, it is not my purpose to punish anybody. I will simply submit this matter to Elmer Underwood, Hugh Fleece and Scott Bullitt, the county attorney (the three named parties represented the Commonwealth) and let them advise with me as to what to do about it.'

"Affiant says that he was hurrying to finish the statement to let the judge look over it that evening to see that it was in the proper form for filing and consideration by the court, and Mr. Underwood and Mr. Fleece and Mr. Bullitt, but about 4:30 p. m., while he was sitting at the desk of the clerk of that court, where Judge Field had arranged the light for me after giving me some paper, the judge said, 'Bob, I'll have to leave you now,' and left before I had been able to finish the statement. I therefore left the court-room shortly after

the judge, as there was no. opportunity of. having the judge look over my statement that evening.

"Having finished the statement the next morning, December 4th, at ten a. m. when court opened, I went up to the judge and handed him the statement I had prepared, and as I believed according to his advice and direction, for consideration by the court, and Messrs. Underwood, Fleece and Bullitt, though in justice to the court I should say right here that the judge has since advised me that I misunderstood him and that he did not intend to convey the idea that the matter of my punishment would be considered by him with counsel for the Commonwealth except in case the response which I filed was sufficient.

"When I tendered the statement to him I said, 'Judge I've got here a brief statement of what I have to say, and I want to put myself on the mercy of the court.' Judge Field then commenced to read the statement and affiant took his seat, and in a few moments, before the judge concluded the reading of the statement, affiant again approached him and said: 'Now, judge, if that statement is not prepared properly, why if it's wrong in any way, tell me wherein it's wrong, and I'll change it.' The judge did not make any direct response to this, but asked me whether I wanted to submit the matter on the statement. I replied, 'Yes.' From my previous conversation with the judge as related, I believed that the statement which I had drawn would be taken up by the court and the three attorneys representing the Commonwealth on the question of my suspension, and never dreamed that by filing the informal statement and throwing myself on the mercy of the court, without filing a formal response of any kind to the rules, that I was submitting on the question of disbarment.

"The judge then said, 'The response is insufficient.' In view of the circumstances as herein set out, namely: Having sought the advice of the judge as to the proper manner in which to present my side of the case, and his kindness and courtesy in offering to assist me and to call his official stenographer for that purpose, and the fact that after this, on account of inability to finish the statement the preceding afternoon in time for Judge Field to look over it, and having presented it on that morning with the statement as above set out, by which

I meant to convey to the court the idea that if the response was not along the lines as advised by him the preceding day that I would immediately put it in such shape as was desired by the court for the consideration of the court, and the Commonwealth's attorneys—for these reasons, I say, I thought it strange when the judge announced, 'The response is insufficient.' I never dreamed that I had been disbarred. I did not know that such was the fact until I saw the newspaper about 1:15 that day, to-wit: December 4, 1914. I was dumbfounded and went immediately to the office of Mr. Underwood, of counsel for the Commonwealth in the matter, and asked him how long I would be suspended. He replied, 'Why, that is a funny question to ask me. That's a question for the judge. All I know about it is that the judge told me to draw up a judgment of disbarment.'

"I then went immediately to Judge Field's office and waited for him to come in. When he came I told him that I understood that he had disbarred me and asked him for how long a time my disbarment was to last. The judge replied, 'Indefinitely.' I then told him that I had understood from my conversation with him on the previous afternoon that Elmer Underwood, Hugh Fleece and Scott Bullitt would consider the case on my statement and decide how much punishment I was to receive. Judge Field then advised me that I had misunderstood him about that, and that he would have called them in and consulted their judgment only in the case of the response being sufficient, and that the response was insufficient and that for that reason he did not consult with them.

"Affiant says by reason of the facts as hereinbefore set out he did not endeavor to file a formal and technically sufficient response to said rules; that the statement submitted to the court by him relating to the rules was not even styled 'Response' by him; that he knows that Judge Field would, under no consideration, have misled him in the matter, and he knows further that if Judge Field had even suspected the possibility of this affiant misconstruing his courtesy and the conversation had with this affiant, that he would have made the situation clear on Thursday afternoon before leaving the court-room, but this affiant says that he was misled and drew what now seems to be an erroneous conclusion from this conversation of December 3rd with Judge Field;

that he felt from the conversation that if he refrained from filing his response and making issue for trial of the action, and in lieu thereof filed a statement of facts presenting his side of the charges that had been made against him, and threw himself upon the mercy of the court, he would receive that mercy in the same degree in which the aforesaid A. P. had received it, namely: By receiving a suspension rather than a disbarment, when said A. P. had adopted a somewhat similar course.

"This affiant says further that if he had not gained that impression from the conversation he would have either obtained a respite of the rule to such time as he was able physically and mentally to give the matter the consideration and attention which it deserved, or if the court would not have granted such respite, he would have employed counsel to file his response to each rule and have the matter tried on its merits.

"That the charges of wrong-doing against this affiant are false and made by enemies of this affiant, and that the falsity of said charges can be proven if this affiant is given an opportunity to make his defense.

"Affiant further says that in repeating his conversation with Judge Field he realizes the impossibility of quoting a conversation of such length *verbatim,* but that he had endeavored to give it in substance exactly as it occurs and believes it will be conceded by this court to be a fair statement of such conversation. That this affiant believes that his conclusions drawn therefrom were reasonable conclusions and such as a man of ordinary prudence would draw therefrom.

"The foregoing statements are true. Robert A. Chreste. Subscribed and sworn to before me this 7th day of December, 1914. Louis Summers, Clerk."

At the same time Chreste tendered a response to each of the rules issued against him. These responses reiterated the substance of the matter set out in the affidavit of Chreste filed in support of his motion and grounds for a new trial.

Action on the motion for a new trial was postponed from time to time until March 13, 1915, when a new trial was refused on each rule, and an order was also made overruling the motion of Chreste to file his verified response to each rule.

The next order in the case appears to have been made on December 11, 1915, at which time it was

"ordered by the court that the following order be and it is hereby entered *nunc pro tunc* as of August 10, 1915, as follows:

"Came defendant, by counsel, and on written motion filed, moved the court for leave to enter a proposed agreed judgment herein.

"Ordered by the court that said judgment be and it is hereby tendered and that said motion to file be and it is hereby submitted."

The proposed agreed judgment mentioned in this order reads as follows: "Comes the plaintiff, Commonwealth of Kentucky, by counsel, and the defendant, Robert A. Chreste, in person and by counsel and in consideration of the dismissal by the defendant, Robert A. Chreste, of his appeals to the Court of Appeals in the four cases against him styled as above, and in further consideration of his waiving any right of appeal in said four actions, which said dismissal and waiver of appeals is hereby expressly agreed to by the said Robert A. Chreste, it is ordered that the judgments heretofore entered be amended so as to read as a whole as follows:

"By agreement of plaintiff and defendant it is considered and adjudged by the court that the right, license and authority of the defendant, Robert A. Chreste, to practice as an attorney and counsellor at law in any of the courts of the Commonwealth of Kentucky, be and the same is hereby revoked to the extent hereinafter stated and that said defendant be and he is now hereby. suspended as an attorney or counsellor at law in the Commonwealth of Kentucky for a period of one year and one month, to-wit: From December 4, 1914, to and including January 4, 1916.

"The foregoing agreed amended judgment was signed for the Commonwealth of Kentucky by A. Scott Bullitt, County Attorney; Hugh B. Fleece and Elmer C. Underwood, as associate counsel for the Commonwealth, and by Thum and Roy as counsel for defendant, Robert A. Chreste and by Robert A. Chreste in his own handwriting."

After considering this proposed agreed judgment and the motion of Chreste that it be substituted in place of the judgment rendered on December 4, 1914, the court overruled the motion and refused to modify in any way the judgment of disbarment previously entered.

The foregoing detailed and elaborate record of what occurred shows that when the judgment of disbarment was entered on December 4, 1914, Chreste, in his response, which was the only defense in his behalf before the court at that time, admitted the substance of the rule charging him with unprofessional conduct in connection with the App case, and the substance of the rule charging him with employing Saunders to solicit business for him, but denied the employment of Sherrick to solicit business, and also denied being a party to the procurement of witnesses who gave false testimony in the case of Schipper v. Louisville Ry. Co.

In view of these admissions and denials in the response of Chreste filed on December 4, we take it for granted that his disbarment was rested upon his conduct in the App case and his employment of Saunders to solicit business. The rule issued on account of his connection with the employment of Sherrick to solicit business for him and the rule issued upon the affidavit of Moran charging him with procuring false testimony in the Schipper case, we may assume were not considered by Judge Field in making up his judgment as to the guilt of Chreste or the punishment that should be imposed. Judge Field could not, of course, have found Chreste guilty on the charge setting forth his employment of Sherrick or on the charge setting forth his procurement of false testimony in the Schipper case, because the statement of fact upon which these rules were based was directly put in issue by the response of Chreste, and no evidence was introduced in behalf of the Commonwealth to support either of the charges. On this appeal, however, it is necessary that we should determine whether the conduct of Chreste as set out in each of the rules issued against him was such unprofessional conduct as justified the court in either suspending or disbarring him, and further find whether under all the circumstances he should have been granted a new trial on the charges of which he was found guilty.

Taking up first the matter of a new trial, our conclusion is that Judge Field should have set aside the order of disbarment entered on December 4, 1914, and granted Chreste a new trial in order that he might have a full and fair opportunity to make such defense to the rules issued against him as he desired to offer.

It is very true that in the response written and filed by Chreste himself on December 4th he confessed, in substance, that he was guilty of the charges preferred in two of the rules issued against him, but in his affidavit in support of his motion for a new trial he set out facts and circumstances, which are not denied in the record, showing that this response was prepared and the matter submitted for hearing under very unusual circumstances, and at a time when he was in such a state of mind as not to clearly appreciate the effect of his response or the consequences that might follow it. It may readily be conceded that when the response was filed Judge Field believed and had the right to believe that the matter under investigation was submitted to him for final judgment and that he had the discretion to dispose of it at once, but it is evident from the uncontroverted statements contained in the affidavit of Chreste that he was then laboring under the impression that a judgment of suspension for a time and not a judgment of disbarment would be entered. We can well understand how Chreste, after confessing the truth of the charges in two of the rules, might have been willing to submit without further delay to a judgment suspending him from the practice of law for a fixed time, for example a year, when he would not have been willing to have agreed to an immediate submission and trial on his response if he had believed or had reasonable grounds to believe that it would be followed by a judgment of perpetual disbarment.

It, of course, needs no argument to illustrate the very wide difference between suspending an attorney from the practice of law for such a time as a year, or even two years, and prohibiting him from ever afterwards engaging in the practice of his profession. The punishment imposed by Judge Field was the severest that he could inflict, and it is not reasonable to believe that Chreste would, in the hurried and informal manner his response was prepared and filed, have agreed to a submission if he had anticipated that so heavy a penalty would have been imposed.

It is not an uncommon thing in criminal cases for a defendant to confess his guilt and consent to the entry of a judgment that has been tacitly or expressly agreed upon and that is less than the greatest penalty that might be inflicted. But it is rare if ever that a defend-

ant understandingly agrees to submit without preparation or trial in the ordinary course to the entry of a judgment imposing the heaviest penalty that could be fixed for the commission of the offense with which he is charged. Almost any person of reasonable discretion and judgment, after being properly advised, would naturally prefer to have a trial in the regular way of the charges against him rather than submit in a hasty and ill-considered manner to an agreed judgment that could not possibly have been made more excessive no matter what state of facts or circumstances were developed on the trial of the case. But here we have the case of a lawyer, when there was no need for haste, hurriedly consenting to a submission that was at once followed by a maximum judgment.

There was, as we are sure, no effort or desire on the part of Judge Field to mislead or deceive Chreste, and judging from the frank admissions in the response prepared by Chreste, it is apparent that he had no intention to deceive the judge. But yet we think, under all the circumstances, that the submission of the rules for trial and judgment in the manner appearing in the record was the result of a misunderstanding on the part of Chreste as to what the decision of the judge would be, superinduced by the polite and obliging manner in which the judge received the proposition to at once submit and have the matter disposed of, as well as by the lenient disposition that the judge had made of other cases involving like offenses.

We, therefore, think that Chreste should have a new trial and the opportunity to introduce evidence, if any he has, in extenuation of his offense, and also evidence as to his previous reputation, if he wishes to do so, in order that in the light of this evidence the judge may be better prepared to enter a judgment corresponding to the nature and gravity of the charges and such a judgment as will be sufficient as punishment and example and yet not too severe for a first offender.

Coming now to consider the sufficiency of the rules to warrant the suspension or disbarment of Chreste, we may take up first the charge relating to the App case. Restating briefly Chreste's connection with this case, it appears that the rule charged, in substance, that Chreste knew of testimony material to a litigant, but would not

disclose it except upon condition that he be employed in the case and receive a fee.

In his response, filed on December 4th, Chreste said that when he went to the court-house on the day of the first trial of the App case he did not know any of the App family or know that the App case was being tried until he heard the attorney for Mrs. App, in the closing argument of the case, speak about a missing witness. "Then after the jury returned their verdict I made inquiry from Mr. Mapother, who was also one of Mrs. App's counsel, and found out that the witness whom I knew about had not testified. I then told the counsel that I would divulge information that might prove valuable to them if I were employed in the case. They agreed to give me 25% of their fee, in consideration of furnishing the missing witness and doing whatever else I might do in connection with the case. * * * I spent several days trying to locate the witness and finally located him and then went out to his home and talked with him fully concerning the facts in the App case, for while I knew that this witness had seen the accident, I had never talked with him fully concerning the facts up to this time. I then arranged to take him down to the App family and to have the App family identify him. I made several trips to the home of the parties, and Mrs. App made several trips to my office, and at all of these times I gave her advice and information concerning her case. * * * The second trial resulted in a verdict for $1,200.00 and I certainly felt that I was entitled to a contingent fee of $150.00 which I received in this case."

In this connection it should be said that there is no charge or intimation in the record that Curley, the witness, procured by Chreste to testify in the second trial of the case, did not actually see the accident in which Mrs. App was injured, or that he did not testify truthfully concerning what he saw; nor is there any charge or intimation that Chreste in any manner wrongfully procured the evidence of this witness or induced him to give any testimony that was not true. The gravamen of the offence charged against Chreste is that, although he knew Curley and the importance of his testimony for Mrs. App, while neither Mrs. App nor her counsel knew Curley or what his evidence would be, Chreste would not divulge the name of the witness or what could be

shown by him until after he had been employed in the case under a contract by which he was to have 25% of the contingent fee that might be received by counsel for Mrs. App.

Stated in simpler form, the question is this: Was Chreste, under the circumstances we have related, guilty of such professional misconduct as would authorize his suspension or disbarment because he would not inform Mrs. App or her counsel of the name and whereabouts of Curley and the materiality of his evidence, until he had been employed in the case as an attorney? We doubt if an attorney is under any duty to voluntarily advise parties or counsel in cases in which he is not concerned of the existence of material evidence known to him, but of which they are ignorant. Indeed, we think that an attorney might with propriety, or at any rate, without subjecting himself either to criticism or punishment, refrain from voluntarily imparting any information in his possession that would aid either of the parties in a personal litigation in which he was not concerned, although of course a case might arise in which an attorney would be remiss in his duty as a citizen and officer of the court if he failed to give information to the parties concerning a material witness. But this App case was nothing more than a suit to recover damages for personal injuries, and Chreste might well have abstained from making any disclosures concerning the witness or the testimony about which he knew.

It is said, however, that although this might be conceded, Chreste committed unprofessional conduct in declining to disclose what he knew until after he was employed in the case under a contract by which he was to receive a contingent fee, and it is this circumstance that is seized hold of to justify the issual of the rule against him.

What is unprofessional conduct of sufficient gravity to constitute an offense that will justify suspension or disbarment is often a difficult question to determine. There are many things a lawyer might do in a professional way that would not comport with the standards of the profession or be in accord with that high sense of propriety that might actuate an honorable attorney, and yet not authorize either his suspension or disbarment. There are also many things in the life and conduct of a lawyer which might justly be criticised from

both a personal and a professional standpoint that would not sustain proceedings to suspend or disbar him. And so it is sometimes hard to draw the line between what is allowable and what is censurable looking at it from a professional standpoint.

But we do not find much difficulty in reaching the conclusion that Chreste's conduct in the App case fell on the wrong side of this sometimes shadowy line. There were two courses that he could have pursued safely and without blame. One would have been to keep to himself the information that he possessed, and the other to have voluntarily disclosed, without fee or reward, what he knew to Mrs. App or her counsel. But he did not see fit to adopt either of these courses. He chose to offer for sale the information that he had concerning the missing witness and put his offer in such a way as to coerce counsel for Mrs. App into accepting his proposition. These counsel knew that there was a missing witness whose testimony was material to them in the case, but they did not know either the name of the witness or his whereabouts; while Chreste knew the witness and that he could procure his attendance. And so, under these circumstances, he said: "I will tell you what you want to know if you employ me in the case; otherwise I will not." In this way Chreste was enabled to secure employment in a case in which otherwise he would not have been employed and by this practice he forced the attorneys in the case to employ him.

A resort to methods like this to secure employment exhibits such low ideals of the standards of honor prevailing in the profession that it may, as we think, be made the basis of a rule to show cause why the attorney guilty of it should not be punished for unprofessional conduct.

Coming now to the rule issued against him on account of his employment of Saunders to solicit business, we find an entirely different condition of affairs from that appearing in the App transaction, and a state of facts that amply justified the issual of the rules. The rule charged that he employed Saunders to solicit his employment by persons who had been injured, and that he agreed to pay and did pay him $8.00 per week and give him an unlimited expense account. That Saunders remained in his service for about a year and during that period secured his employment in many cases. That he

instructed Saunders to say in soliciting employment from persons of the Catholic religion and from persons of Irish descent that he represented O'Doherty & Yonts, and to say in other cases that he represented Edwards, Ogden & Peak.

In his response to this rule, Chreste admitted that he did employ Saunders upon a weekly salary and gave him an unlimited expense account to solicit business for him; but denied that he had ever authorized or instructed him to make any representations concerning the law firms of O'Doherty & Yonts or Edwards, Ogden & Peak. So much of the rule as referred to O'Doherty & Yonts and Edwards, Ogden & Peak did not contain any serious or indeed material imputation upon the professional conduct of Chreste. The gravamen of the charge consisted in his employment of Saunders to solicit business for him, and this part of the charge Chreste confessed he was guilty of.

Quite a similar state of affairs was set out in the rule based on the affidavit of Sherrick, but all this was denied by Chreste.

In the case of Lenihan v. Com., 165 Ky. 93, and Chreste v. Louisville Ry. Co., 167 Ky. 75, we had occasion to set down a few observations about the practice of soliciting business by lawyers, and in the Lenihan case said this: "It is generally known that there are lawyers who solicit employment in cases in which they would not otherwise be engaged, and this conduct on the part of a few has subjected the profession as a body to no little reproach and the lawyers engaged in this practice to much deserved censure."

And in the Chreste case it was said: "That as personal solicitation is not condemned at common law or denounced by our constitution or statutes, and the further fact that it is difficult to perceive upon what theory it can be said to be clearly injurious to the public good, we conclude that mere solicitation on the part of an attorney, unaccompanied by fraud, misrepresentation, undue influence or imposition of some kind, or other circumstances is not of itself sufficient to render a contract between an attorney and client void on the ground that it is contrary to public policy."

But there is a very wide difference between the unprofessional and undignified practice of personal solicitation of business and the indefensible and vicious prac-

tice of employing agents and runners who are not lawyers to go about the country soliciting business and stirring up strife and litigation for a stipulated consideration or a contingent fee. Such agents and runners as these are not restrained in their activities by any professional or ethical sense of propriety. Their sole object is to secure clients for their employers and they use in this effort such arts and schemes as will get results without giving any thought or attention to the disturbing and objectionable nature of the business in which they are engaged.

The friends, acquaintances and associates of an attorney have of course the unquestioned right to sound his praises and divert to him such clients as they can persuade in a legitimate way to engage his services. But there is a manifest difference between securing business through the influence and efforts of friends, acquaintances and associates and securing it through the methods employed by the strictly commercial enterprise of hired agents. And it would seem at first impression to strike any fair-minded man, whether lawyer or not, as being highly improper for an attorney to have agents or runners to go about and make their living by securing for him employment in cases he would not otherwise get. It is entirely outside of the legitimate functions of an attorney to incite litigation, although it should be said that there are few who indulge in this unprofessional conduct, and, obviously, it is much more reprehensible for an attorney to hire another, and often irresponsible, person to do this for him.

It would also be idle to say that solicitors such as Sherrick and Saunders confined their efforts merely to persuading prospective clients who had already made up their minds to litigate to engage the services of the attorney they represented without in any way endeavoring to induce them to bring a suit or present a claim or demand. When men accept employment to render such service as these men were expected to render, and their pay depends on the volume of business they can get for their employer, everybody knows that many of them will use every means possible to obtain the business without any regard to the method that may be used to secure it. And it is too plain for argument that under a just and enlightened administration of the law practices like this which it is charged Chreste engaged in, should not be

tolerated by officers of the court: Ingersoll v. Coal Creek Coal Co., 117 Tenn. 263, 9 L. R. A. (N. S.) 282; Alpers v. Hunt, 86 Cal. 78 L. R. A. 483; Langdon v. Conlin, 67, Neb. 243, 60 L. R. A. 429.

In the matter of Clark, 184 N. Y. 222, the Court of Appeals of that state had before it the question whether it was lawful for an attorney to solicit business through agents not lawyers, employed for the purpose and receiving a stipulated or contingent reward for their services, and in the course of the opinion, the court said:

"It is said that the law permits attorneys to solicit business and hence that there is no valid reason why they should not be permitted to pay agents to solicit business for them. But, for nearly a century the law has prohibited them from obtaining retainers by offering or giving any valuable inducement whatever to the desired clients themselves, for the plain reason that such conduct tends to stir up litigation which might not otherwise arise and because needless litigation has always been deemed a public evil. It is equally manifest that the employment of paid agents has the same tendency. Where, as in the case at bar, the remuneration of the agent depends upon the number of retainers he procures, the strongest motive exists on his part to incite the assertion and prosecution of claims that might otherwise never be heard of. Nor is there anything in the suggestion that the employment of such paid emissaries is essential to the protection of the poor, who else might not become aware of their right to prosecute remedies in the courts for wrongs which they may have suffered. The permission which the law now gives to attorneys to serve clients for a contingent fee is sufficiently well known throughout the community to enable any one, however limited his means, to secure adequate professional service in the enforcement of any meritorious claim in the courts. It is not necessary for the protection of the poor to sanction the practice which, as applied to negligence cases under the name of 'ambulance chasing,' has brought deserved discredit upon those engaged in it; and in any event, if the views which have been expressed are correct, the law denounces the practice as criminal."

It should, however, be stated in this connection that in New York they had when this opinion was written, a statute prohibiting the practice engaged in by Clarke,

and so what was said by the court was in response to the argument that the statute did not apply to the case in hand. But, aside from the statute, what was said by the court is good morals as well as good sense and very pertinent to the case we have. It is true there is no statute in this state undertaking to regulate the conduct of attorneys at law in matters such as here appear; but the absence of such a statute does not take from the courts their inherent power to so regulate and control the professional conduct of officers of the court such as attorneys are, as to oblige them to so demean themselves as not to bring reproach upon the profession to which they belong. The powers of the court in this respect need not be prescribed by statute before they can be exerted in the interest of maintaining the honor and dignity of the profession and to prevent the incitement of litigation by persons hired to stir it up.

In Commonwealth v. Roe, 129 Ky. 650, it was said upon this point: "Section 97 of the Kentucky Statutes provides that 'No person convicted of treason or felony shall be permitted to practice in any court as counsel or attorney at law.' But this does not mean that only those who have been convicted of felony or treason may be disbarred. It would be doing a serious injustice to the intelligence of the law-making department of the state to hold that such was their intention, or to conclude that, by the enactment of this statute, they meant to declare that, however flagrant the misconduct of an attorney, if it was less than a felony the courts were powerless to protect themselves, the profession and the public. The statute points out two of the causes that peremptorily warrant disbarment proceedings, but it does not, and was not designed to, limit the right to the causes mentioned. An attorney may be guilty of many offenses, evidencing a want of honest probity and good moral character, that would authorize the court to disbar him independent of the statute. * * *

"Courts independent of statutes have at all times possessed the inherent right to control and regulate the official conduct of their officers, and to inflict upon them punishment for official misconduct. Attorneys at law are officers of the court and it has always been the rule in this state that, when the attention of the court in which they practice was called to acts of professional misconduct, it had the right to disbar them if the facts of the

case justified the infliction of this punishment." To the same effect is Lenihan v. Commonwealth, 165 Ky. 93.

As to the rule issued against Chreste, based on the affidavit of Moran, little need be said. If he was guilty of the charge presented in this affidavit, he of course committed as grave an offense as an attorney could be guilty of.

For the reasons indicated the judgment is reversed, with directions to grant Chreste a new trial; the whole court sitting.