## Louisville Bar Ass'n v. Hubbard.

Feb. 16, 1940.

Rehearing Denied May 31, 1940.

Hubert Meredith, Attorney General, for complainant.

William Alpha Hubbard, David A. McCandless, Jr., and Mc-Candless & McCandless for respondent.

OPINION BY SIMS, COMMISSIONER—Confirming report.

The Louisville Bar Association filed a complaint against William Alpha Hubbard, charging him with unprofessional conduct. Upon a hearing, the Board of Bar Commissioners found respondent guilty and this proceeding is now before us on the report of the Board. The complaint as amended made four charges against respondent: (1) That through an employed negro solicitor, and by improper personal solicitation, respondent obtained employment in six cases known as the Knight, Fonville, Moats, Marchbanks, Wigginton and Spies cases; (2) securing, and attempting to secure, false testimony in two cases known as the McCall and the Home Laundry cases; (3) that he entered into a conspiracy with the negro solicitor and a doctor in Louisville, whereby excessive fees were paid the doctor by respondent's clients for medical services rendered them; (4) that while administering certain estates respondent handled same for his own interest and to the detriment of the beneficiaries.

The record before us is quite voluminous, running into several thousand pages, and the splendidly prepared report of the trial commissioners, even though very concise, covers 57 pages; therefore, it is evident we cannot go minutely into the various charges and keep this opinion within reasonable bounds. We will not discuss the charges which the Board found were not sustained and in discussing those which were sustained, we will do so only in a general way, yet, hoping to draw a picture of the case. After reading the record and giving it most careful consideration, we have reached the conclusion the trial commissioners gave respondent the benefit of every reasonable doubt, and in each instance wherein their report sustained the charges there was abundant evidence to support same.

The hearing was conducted before two bar commissioners, who found the charges were sustained in the Knight, Moats and Marchbanks cases in the first accusation, and were not sustained as to the other cases included therein, but that respondent's conduct in the Fonville and Spies cases deserves censure; that the second charge was not sustained but that respondent's conduct in the McCall case deserves censure; that the third charge was not sustained; that the fourth charge was sustained. Thereupon the trial commissioners recom-

mended respondent be suspended from the practice of law in this state for the period of three years and that he be publicly reprimanded. Upon a hearing before the full Board of Bar Commissioners of the Kentucky Bar Association, the recommendation of the trial commissioners was adopted.

Respondent, a man in his middle fifties, was admitted to the Bar in 1911, and has spent the greater part of his professional life in Louisville. His home is in the country some twelve miles from the city, and his physician advised respondent not to drive a car due to his health. So he employed George Eaton, a negro about 49 years of age who resided in Louisville, as a chauffeur at a salary of $30 a month. Respondent's wife, who was also his secretary, drove him to and from his office and home. Respondent testified Eaton's only duties were to drive him about the city, and to run errands for him, occasionally to locate colored witnesses and to make investigations among them. But this record convinces us Eaton's duties were not limited to those of a chauffeur, and he plays a prominent part in the first four cases mentioned in the first charge, and also in the McCall case mentioned in the second charge.

In the Knight case, it was Eaton who reported Mrs. Knight's accident to respondent and who took him to her home the morning after the accident. It was Eaton's wife who wrote a letter for Mrs. Knight to sign on the night after her injury, discharging an attorney which her husband had employed to represent her before respondent was employed. It was Eaton who removed the Knight family to another place of abode in respondent's car, and who made promises of clothes to her husband. In the Moats case, it was Eaton who immediately after witnessing the accident handed Moats one of respondent's professional cards and solicited the case for him, telling Mr. Moats that if respondent was given the employment he would take care of the witnesses. It is interesting to note that Moats in 1923 served several months on the police force and recognized Eaton as a "court runner," who solicited business for unethical attorneys. In the Marchbanks case, Eaton was at the injured woman's home twenty minutes after she had returned from the hospital on the day of the accident soliciting the case for respondent. In the Mc-

Call case, Eaton was in the back room of McCall's home coaching witnesses in false statements, which statements were taken down by respondent in an adjoining room. Before respondent arrived, Eaton was at the hospital with the injured boy in the Fonville case. For just a chauffeur, Eaton possessed rare qualities for being in the company of those who just a few hours previously suffered personal injuries in accidents, but his ubiquity appears not to have interfered with his duties as a chauffeur for respondent. No fair mind can read this record without being convinced Eaton was employed by respondent not only as a chauffeur but also as a solicitor of negligence cases, and that Eaton was most energetic, aggressive and efficient in the latter work.

When respondent visited the Knight home the morning after her accident, he had with him a typewritten form of contract, and all that was necessary to give respondent a contract to file suit on a contingent fee of 50%, was to fill in the date, the nature of the accident, and obtain the signature of the injured person. Although he knew Mrs. Knight's husband had previously employed an attorney in this matter, respondent entered into a contract with her on the theory her husband could not bind his wife by any contract he made; and well within twenty-four hours after the accident, he had filed suit for Mrs. Knight. We have stated that on the night following the injury, and after respondent had filed suit for Mrs. Knight, Eaton's wife wrote a letter to the attorney her husband (Mr. Knight) had previously employed, dismissing him from the case; but we have not stated that the following day a registered letter purporting to be from the Knights came to respondent's office, which he refused to accept from the postman. So in a day or two thereafter a notice was served upon respondent discharging him from the case. That was on Saturday, and on the following Monday Mrs. Knight's husband appeared in respondent's office, obtained $15 from him in addition to his agreement to furnish the Knight family with groceries; and respondent was again in command of the case. It is true the Knights were in destitute circumstances and respondent says that he helped them, not as clients, but as objects of charity; however, the unusual circumstances surrounding this case cast suspicions upon respondent's philanthropy. This matter was brought to the attention of

Judge Fields when the suit filed by respondent and a suit filed for Mrs. Knight on this same accident by another attorney came up for trial. Judge Fields very properly had a full and complete hearing in open court, as is shown by a record of 250 pages, which resulted in the court's refusal to let either of them continue as Mrs. Knight's attorney.

Respondent denies knowledge of Eaton soliciting for him in the Moats case and testified he visited Moats when informed by Eaton that Moats desired his services as an attorney. Moats testified that when he wanted to postpone bringing suit until it could be determined whether or not the insurance carrier would settle, respondent advised immediate action and referred to the representative of the insurance carrier as a "damn big crook." In the Marchbanks case, respondent testified he did not know Eaton had solicited the case, but that he called on this woman at the instance of a relative who was injured in the same accident and whom he represented. But Carrie Mae Marchbanks testified that she informed respondent that a Mr. Frankenberger was her attorney and that he replied, "Well, you never can tell about Jews, they might go in with the company lawyer." That in her nervous condition respondent so importuned her to give him the case, that she employed him despite the fact that she wanted Mr. Frankenberger to represent her. Also, in the Knight case, there was evidence that respondent referred to another attorney, who held one of the four contracts Mrs. Knight or her husband had executed, as being a cheap police court lawyer. Respondent denies making any of these disparaging remarks about other lawyers and the insurance adjuster, but from the picture of respondent as painted by this record, we are of the opinion he did so.

While it is not within keeping with the ethics of the profession, and we do not condone it, yet, an attorney may personally solicit business with impunity, where he does not take advantage of the ignorance, or weakness, or suffering, or human frailties of the expected clients, and where no inducements are offered them. However, if such personal solicitation by an attorney is accompanied by taking advantage of the expected clients, or by disparaging remarks about other attorneys, or where "hospital haste," as said in the commissioner's report,

is resorted to in obtaining a contract of employment, or in filing suit before the circumstances of the case and the extent of the injuries can be fully known, such conduct brings the profession in disrepute and is injurious to the administration of justice, and makes the attorney guilty of unprofessional conduct for which he may be disbarred or suspended from the practice. It is the gravest breach of professional ethics for an attorney to obtain employment through the use of employed agents or "runners," and this indefensible and despicable practice has long been ground for disciplining attorneys in this state by permanent disbarment, or by suspension from the practice for a given period; Lenihan v. Com., 165 Ky. 93, 176 S. W. 948, L. R. A. 1917B, 1132; the first two cases of Chreste v. Louisville R. Co., 167 Ky. 75, 180 S. W. 49, L. R. A. 1917B, 1123, Ann. Cas. 1917C, 867; Id., 173 Ky. 486, 191 S. W. 265; and the two cases of Chreste v. Com., 171 Ky. 77, 186 S. W. 919, Ann. Cas. 1918E, 122; Id., 178 Ky. 311, 198 S. W. 929. This record convinces us that respondent's personal solicitations of employment in the Knight, Moats, and Marchbanks cases so far overstepped the bounds of propriety as to merit his suspension. It further convinces us that Eaton was employed as a "runner" under the guise of a chauffeur and that Eaton solicited these three cases for his employer; certainly, this conduct by respondent merits his suspension.

We will dispose of the Bodenbenner matter in as short a space as possible and will avoid going into specific figures and dates. Respondent qualified in July, 1935, as administrator of Joe Bodenbenner, who left an estate of approximately $29,000. On Aug. 1, 1935, he drew a check for $650 payable to cash, out of which he gave Mrs. Bodenbenner $150, applying the remaining $500 on his commissions; and on Sept. 3, following, he drew a like check for $500 giving her $150 and applying the remaining $350 on his commissions. On Sept. 1, 1935, he borrowed $12,000 from himself as administrator under the guise of borrowing it from Mrs. Bodenbenner by making an advancement to her out of the estate of $12,000 in securities, and taking her receipt for same, which securities were never delivered to her. He fully secured this loan by a mortgage on a new home he was building. Then on April 25, 1936, before he made a settlement of this estate the following May, he conveyed

Mrs. Bodenbenner and her daughter, Miss Josephine, his former home. He testified the consideration was $15,500, (Miss Josephine testified it was $14,000), of which $12,000 was paid by surrendering to him his notes, and $1,800 was paid by Miss Josephine; and respondent cannot say how the balance was paid. Upon the settlement of the estate in May, 1936, there was $5,800 in cash going to Mrs. Bodenbenner, and respondent took from her a power of attorney allowing him full and broad authority in managing her property. On June 1, he loaned himself $2,800 of this sum and by the end of the following September he had loaned himself the last dollar of this fund, which loans were unsecured, but which he says met with the full approval of Mrs. Bodenbenner and her daughter.

He wrote Mrs. Bodenbenner's will wherein he was named as executor, and upon qualifying as such, $1,300 came into his hands. He opened no bank account, but deposited this money in his own personal account on the flimsy excuse that he realized that it would soon have to be paid out for doctor bills and funeral expenses. There was an unsuccessful suit filed to contest Mrs. Bodenbenner's will, the trial of which disclosed how respondent was handling her estate. Miss Josephine then filed a motion before the county judge to have respondent removed as executor, which motion the court granted, giving him 30 days wherein to settle his accounts; and which respondent did without loss to the estate.

It is contended by respondent that as the estate lost nothing, he was not culpable. However, that is not the test. A settlement with clients will not stop disbarment proceedings since the court will not permit such matters as affect the character of attorneys, who are officers of the court, to be settled privately with clients; 7 C. J. S., Attorney and Client, 767, Section 25, Subdivision c. The presumption of invalidity is complete where a fiduciary contracts with himself personally. 3 Pomeroy's Equity Jurisprudence, Section 956, 957; Clay v. Thomas, 178 Ky. 199, 198 S. W. 762, 1 A. L. R. 738; Walker v. Carter, 208 Ky. 197, 270 S. W. 770. Since Mrs. Bodenbenner was nearly 80 years of age, understanding and speaking but little English, and her daughter, Miss Josephine, was a woman without any business experi-

ence, and as both the mother and the daughter had implicit confidence in respondent, it cannot be said the cestui que trustent were capable of coping with respondent. The evidence was conflicting as to the market value of the property which respondent sold these women for $14,000, or for $15,500 as he contends, but the trial commissioners found its value at the time of sale to be $9,500 and we are of the opinion the evidence supports their finding. The manner in which respondent handled these two estates shows he either had sinister motives, or else he was a very incompetent lawyer. He introduced proof showing that he was not only a competent lawyer, but that he was experienced in handling estates; therefore, we cannot escape the conclusion that he handled these estate to a large extent for his own benefit and to the detriment of his clients.

Respondent argues that this proceeding was conceived in malice, which fact should be taken into consideration as was done in Com. ex rel. Buckingham v. Ward, 267 Ky. 627, 103 S. W. (2d) 117. An answer to this argument is there is nothing in this entire record which even intimates that this proceeding was instigated through malice. It is shown to be the result of an investigation started by Judge Fields, when the shocking situation in the Knight case developed in his court. His argument that the good reputation he proved by many prominent lawyers and judges in Louisville shows the penalty inflicted is excessive, citing In re Weaks, 274 Ky. 194, 118 S. W. (2d) 525. There was only one charge against Weaks, that he settled a case without authority, which is not near so grave as any of the several charges filed against respondent. Respondent was not dealt with harshly, but rather leniently. This is a civil and not a criminal proceeding, and a cause for disbarment or suspension may be established by a reasonable preponderance of the evidence, and proof beyond a reasonable doubt is not required. In re McDonald, 157 Ky. 92, 162 S. W. 566; Com. ex rel. Buckingham v. Ward, supra. Yet, the trial commissioners gave respondent the benefit of every doubt. When Eaton and McCall turned against respondent, the commissioners refused to consider their evidence because they admitted they had previously given false testimony. In the Home Laundry case, the trial commissioners refused to sustain the charge that respondent offered to bribe a witness to give false testi-

mony because they believed it improbable that any man would attempt to do such in the presence of others.

We are convinced that the trial commissioners not only gave respondent a fair and impartial trial, but that they gave him the benefit of every doubt, and that in recommending his punishment they were fair to the extent of leniency. The full Board approved the report of the trial commissioners and adopted their recommendation, and the record shows no reason why we should disturb it. It is therefore the order of this court that respondent be suspended from the practice of law in this Commonwealth for three years from the date this opinion becomes final, and he is hereby reprimanded.

Whole Court sitting, except Judge Fulton.