KENTUCKY BAR ASSOCIATION,
Complainant,

v.

**Donald M. HEAVRIN, Respondent.**

Supreme Court of Kentucky.

Oct. 31, 1978.

Rehearing Denied Jan. 3, 1979.

Leslie G. Whitmer, Director, Michael M. Hooper, Kentucky Bar Ass'n, Frankfort, for complainant.

Henry A. Triplett, Louisville, for respondent.

PER CURIAM.

In this disciplinary proceeding the Kentucky Bar Association charged Donald M. Heavrin, a Louisville attorney and a member of the Kentucky Bar Association, with seven counts of unethical conduct calculated to bring the bench and bar of Kentucky into disrepute. A trial committee consisting of three members filed an opinion with one member of the committee filing a dissenting opinion recommending that the Board of Governors dismiss the charges because Heavrin alleged the Kentucky Bar Association had not proceeded properly under the provisions of former RAP 3.160.[1] On July 16, 1977, the Board of Governors sent the case back to the trial committee to make recommendations on the merits. Then on January 2, 1978, the trial committee recommended dismissal of all charges by unanimous vote. Subsequently on March 18, 1978, the Board of Governors, after full consideration, voted on the issue of guilt or innocence. Ten members of the Board found Heavrin guilty on Counts IV through VII and recommended that he be suspended from the practice of law in this Commonwealth for a period of two years. It was further recommended by the Board of Governors that Heavrin pay the costs of these proceedings. One member found him not guilty. Thereafter Heavrin filed in this court a notice for review and brief.

This court has reviewed the record including the proceedings of the Jefferson Circuit Court entitled *"Citizens Fidelity Bank and Trust Co. v. Donald M. Heavrin,"* No. 176498, which by stipulation the parties made a part of this record all of the testi-

---

1. *"The Initiation of Disciplinary Cases*

(a) Any complaint against an attorney for unprofessional conduct shall be filed with the Director who shall promptly notify the attorney by certified mail of the complaint and inform him that he has 15 days to acknowledge receipt of the complaint or respond to the merits." Amended Oct. 14, 1977, effective Jan. 1, 1978. (No substantial change in this section.)

mony and proceedings of the Jefferson Circuit Court.[2]

In order to place the issues in proper perspective, this court is of the view that the findings of fact and conclusions by the Board of Governors very aptly cuts through the voluminous and prolix testimony presented before the trial committee including the evidence presented in Civil Action No. 176498 styled *"Citizens Fidelity Bank and Trust Co. v. Donald M. Heavrin."*[3] The finding of facts and conclusions of the Board of Governors are as follows:

## FACTS

"The facts of the case are drawn from the proceedings of the Jefferson Circuit Court, entitled *"Citizens Fidelity Bank and Trust Company v. Donald M. Heavrin,* No. 176498". By stipulation, the parties made a part of this record all of the testimony and proceedings of the Jefferson Circuit Court.

Sometime in March, 1972, Heavrin was employed and undertook to represent James F. Donoghoe, a former member of the association, on a charge of uttering a worthless check in the amount of $3,000.00. It appears that Donoghoe had some bizarre arrangement with certain clients in Pennsylvania to use $42,500.00 of a settlement he had made for them in a personal injury case. Donoghoe was to use the $42,500.00 in a real estate deal upon the payment of 9% interest to the client, subject to the right of the client to call upon Donoghoe from time to time for payment. The $3,000.00 which gave rise to the prosecution represented a check by Donoghoe to these clients which bounced. A Warrant was issued for Donoghoe's arrest and an arrangement was made with the County Attorney's office, whereby Donoghoe paid the $3,000.00 bad check and the case was continued by the County Attorney's office until payment in full was made to the client.

Sometime during the course of his representation of Donoghoe Respondent learned that Donoghoe was being threatened with further criminal prosecution and disciplinary action before the Bar Association if the full amount of the unpaid balance was not immediately paid. The Respondent testifies that he informed Donoghoe that he must make restitution to these clients before the charges would be dismissed. The Respondent on one occasion engaged in a heated telephone conversation with one of the Pennsylvania clients in which the Respondent was informed that prosecution would ensue unless the money was paid.

The Respondent testifies that he felt Donoghoe was being taken advantage of, therefore, he made arrangements to loan Donoghoe the money and the criminal prosecution subsequently abated.

The Respondent admits he did not have the money to loan, however, he undertook to raise the money and this is where the problems began to arise in this case.

The Respondent had previously represented one Norman Bodenbender and borrowed money from him personally on other occasions.

It appears that Mr. Bodenbender was a person of some means but secreted the full extent of his assets. The Respondent called Bodenbender and asked for the loan and Bodenbender questioned the purpose of the loan. At this point the Respondent felt his duty to his client (Donoghoe) prevented him from disclosing the purpose was really to bail out a recalcitrant lawyer so he told Bodenbender it was for a real estate deal.[4] The conversation culminated in a loan to

---

2. One volume consisting of the original record, eight volumes of depositions, and three volumes of evidence.

3. The trial court absolved Heavrin of liability except for $11,000.00 he received when the $105,000.00 check was presented to Citizens for deposit. This was before Maureen Collie,

who authorized the transaction, knew anything concerning the questionable endorsements.

4. In lawyer's language this is a misrepresentation. In Layman's language this is a lie.

the Respondent by Bodenbender in the amount of $32,500.00 some two days later.

During the conversation and prior to his getting the money from Bodenbender, the Respondent admits that he was becoming suspicious of Donoghoe's actions[5] but in spite of his suspicions, he still felt that he could help him out of these difficulties and they discussed the matter of security for the loan from Respondent to Donoghoe.

Respondent states he was impressed with Donoghoe's apparent affluence (airplanes, boats, cars, diamonds) and it was arranged that Donoghoe would sell to the Respondent some jewelry worth from $100,000.00 to $200,000.00 for $44,000.00, with an option in Donoghoe to repurchase the jewelry within thirty days at the principal amount plus 9% interest. A document to this effect was drawn up between Donoghoe and the Respondent.

With the $32,000.00 ($32,500.00) loan from Bodenbender, the Respondent paid $10,-000.00 to Fidelity Finance Corporation to pay off a loan to Donoghoe and get a release of the jewelry they were holding as collateral. The remainder of the loan was used to keep Mr. Donoghoe's Pennsylvania clients from filing complaints with the Bar Association. To further carry out the plant, (sic) the Respondent borrowed $10,-000.00 from his father.

The Respondent took possession of the jewelry in question and took it to a jewelry dealer for safekeeping, intent upon returning and claiming the jewelry at the end of thirty days in the event Donoghoe did not come up with the money.

On June 12, 1972, Donoghoe came into possession of a check in the amount of $105,000.00 in settlement of a claim. The check had a number of payees on it, including a lawyer by the name of Haddad in Miami, Florida (no relation to Frank Haddad). Donoghoe tried to cash the check at Liberty National Bank. The bank was somewhat suspicious of Donoghoe because of indications he had previously kited checks between banks in Louisville and Mr. Netherton from Liberty told Donoghoe to have the check certified.

In the meantime, Mr. Haddad of Florida called Netherton concerning a bad check of Donoghoe's and Netherton mentioned the $105,000.00 check which had Haddad's name on it and Haddad said he hadn't endorsed it.

Donoghoe flew to Chicago and had the check certified and when Donoghoe presented the check again, Netherton wouldn't cash the check because of his conversation with Haddad concerning a possible forgery.

After the second refusal by Liberty to cash the check, Donoghoe consulted with the Respondent who proceeded to assist him in cashing the check. Donoghoe and the Respondent went to the Liberty National Bank and attempted to cash the check and were refused, whereupon Heavrin became incensed, quoted some law about the UCC to the officer of the bank, and indicated he would take it to his bank at Citizens who would cash it.

Mr. Netherton of Liberty, having friends in the banking fraternity, attempted to call a friend at Citizens to warn him about the endorsement on the check, but was unable to reach him until Monday, June 19, 1972, at which time he alerted a Mr. Maple at Citizens of possible forged endorsements.

On June 15, 1972, Donoghoe gave a check for $49,000.00 to the Respondent to repay the loan the Respondent had made to Donoghoe, together with his fee. Within thirty minutes after the Respondent received the check from Donoghoe and deposited it to his account, Donoghoe called him and informed him that the check for $49,000.00 was no good because his wife had paid a series of large bills. Mr. Heavrin then wrote a check on his own account to Donoghoe in the amount of $49,000.00 which he admittedly did not have in his account.

On Friday, June 16, 1972, the Respondent presented the $105,000.00 check to Mrs.

---

5. This was prior to June 15, 1972.

Maureen Colley (sic) at the Citizens Bank and Mrs. Colley's (sic) testimony is that Heavrin represented to her that he knew personally each person had endorsed the check.

Heavrin denies this [6] and, in fact, there is some controversy whether Heavrin endorsed the check in the presence of Mrs. Colley (sic) or had already endorsed it prior to presenting it to her.

In any event, there was some controversy prior to the cashing of the check but after consultation with bank officials, and the check bearing certification, the Citizens Fidelity cashed the check; whereupon, the Respondent put $45,000.00 in his attorney account, $49,000.00 in his personal account, and took $11,000.00 in cash which he turned over to Donoghoe.

On June 16, 1972, the Respondent wrote a check payable to cash for $35,000.00 on his Attorney at Law Account and later deposited the same in his Escrow Account at the Bank of Louisville. On the same day he drew a check to Donoghoe in the amount of $48,958.00 on his personal account, and further on June 19, 1972, he certified a $10,-000.00 check on his Attorney at Law Account making it payable to himself, which was then placed in his Escrow Account with the Bank of Louisville.

On June 17, 1972, he deposited the $35,-000.00 in his Escrow Account and made disbursements in the following sums:

$57.00 to Dennis O'Connor

$5,489.50 to Thomas B. Robertson, Sr.

$569.50 to James F. Donoghoe

$24,884.00 to Norman Bodenbender

$2500.00 to Don N. Heavrin

$1500.00 to Don N. Heavrin.

A further recitation of facts is unnecessary, however, we deem it appropriate to note that eventually it was found the endorsement on the checks were either wholly or partially forged, and litigation arose between the Citizens Fidelity Bank and all parties, including the Respondent, Heavrin, to establish liability for the forged endorsements. The Judgment of the Jefferson Circuit Court found the Respondent, Heavrin, liable for $11,000.00 which the Bank turned over to him in cash personally and which he later gave to Donoghoe.

## QUESTIONS PRESENTED

1. Does the Conduct of Heavrin With Respect to His Dealings With Donoghoe Constitute Unethical and Unprofessional Conduct Calculated to Bring the Bench and Bar of Kentucky Into Disrepute?

2. Is the Bar Association Barred From Bringing These Disciplinary Proceedings on the Grounds That the Decision of the Jefferson Circuit Court in the Civil Action is Res Judicata?

## FINDINGS

On June 23, 1977, the Trial Committee duly appointed herein, filed a Trial Committee opinion, one member of the committee filing a dissenting opinion, recommending that the Board of Governors dismiss the charges because Respondent alleged the Bar Association had not proceeded properly under the provisions of former RAP 3.160. On July 16, 1977, the Board of Governors entered the following order:

'Motion adopted by the Board of Governors referring the disciplinary matter concerning Donald M. Heavrin back to the Trial Committee with the direction that the Trial Committee file on or before September 9, 1977, a report in compliance with RAP 3.360. The report may still include a recommendation to dismiss for procedural defects.'

The Board feels the Respondent's conduct with respect to cashing the $105,000.00 check was in direct contravention of DR 1–102(A)(4). Further, the Board finds a violation of DR 9–102(A) relative to the separation of funds. No amount of check

---

**6.** The majority of the court believes Ms. Collie.

manipulating by the Respondent as went on in this case can be justified under the circumstances which are evident when the entire facts are documented. It is tragic the manipulations of the Respondent caused the financial losses documented in this sordid affair.

The Board further finds the conduct of the Respondent constituted a reckless disregard for the rights of the payees on the checks in question and is a violation not only of Canon 9 of the Code of Ethics in regard to Trust Funds, but also DR 1–102.

The Board cannot accept the Respondent's explanation of his conduct, especially in view of the uncontroverted testimony that prior to his entering into this sordid check cashing affair, he was suspicious of Donoghoe's conduct. No attorney owes the duty to a client to enter into a course of action destined to lead to the bilking of innocent parties of their money. Once having entered into this course of conduct the Respondent then devoted most of his energy to the protection of his own financial interests and not to the protection of the parties rightfully entitled to the funds.

The Respondent's contention that disciplinary action in this case is barred under the doctrine of Res Judicata is not valid. Res Judicata prevents a retrial of a matter which has been decided on the merits, *9 ALR 3rd 210, Sec. 2(B)*. This matter has further been decided by the Court of Appeals in the case of *Ratterman v. Stapleton*, Ky., 371 S.W.2d 939 (1963).

"The Board differs with the Trial Committee in that a majority of the Board feels the conduct of the Respondent as set out above constituted conduct calculated to bring the bench and bar of Kentucky into disrepute [7] for the foregoing reasons."

This court has reviewed the record and a majority of the members are of the opinion that the record adequately supports the conclusions of the Board of Governors of the Kentucky Bar Association [8] that Heavrin is guilty of unprofessional conduct of sufficiently serious nature to warrant that he be suspended from the practice of law in this Commonwealth for a period of two years. The Board of Governors found that Heavrin had violated Canon 1 of the Code of Professional Responsibility which provides that a lawyer should assist in maintaining the integrity and competence of the legal profession. It found also that Heavrin violated Disciplinary Rule 1–102(A)(4) which states that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation. The Board found also that Heavrin violated Canon 9 of the Code of Professional Responsibility which provides that a lawyer should avoid even the appearance of professional impropriety. It is the view of the majority of the members of this court that Heavrin was more interested in protecting his interests than that of his client and that he knew at all times what he was doing. It is also the view of the majority of the members of this court that Heavrin was not a "lamb led to the slaughter" by the artful cunning of a skilled con man, James F. Donoghoe, a former member of the Kentucky Bar Association who has previously been permanently disbarred.

It is therefore ordered that Donald M. Heavrin is hereby suspended from the practice of law in the courts of this Commonwealth for a period of two years and it is ordered that he pay the costs of these proceedings.

All concur except PALMORE, C. J., and CLAYTON, J., who dissent.

PALMORE, Chief Justice, dissenting.

The Trial Committee which heard the evidence in this case found Heavrin guilty

---

7. This is a standard which is neither vague nor ambiguous. *See Nicholson v. Judicial Retirement and Removal Commission*, Ky., 562 S.W.2d 306, Part I (1978).

8. This is a civil not a criminal proceeding. Proof by a preponderance of the evidence is all that is required. *Louisville Bar Ass'n v. Hubbard*, 282 Ky. 734, 139 S.W.2d 773 (1940); *Commonwealth v. Richie*, 114 Ky. 366, 70 S.W. 1054 (1902); see also *Kentucky Bar Ass'n v. Franklin*, Ky., 534 S.W.2d 459 (1976).

of nothing more than bad judgment, and recommended unanimously that all charges against him be dismissed. Ten members of the KBA Board of Governors nevertheless found him guilty on the last four of seven counts.

Count 1 of the formal charges related to the alleged loan of money by Heavrin to Donoghoe, secured by a pledge of jewelry. Count 2 cited the circumstances of the loan to Heavrin from Bodenbender. Count 3 charged Heavrin with covering up ethical misconduct on the part of Donoghoe by borrowing money to pay the claims of his disgruntled clients. These are the three counts on which both the Trial Committee and the Board of Governors found Heavrin not guilty of any unethical conduct. The other four counts all relate to the handling of the $105,000 check and its proceeds and the exchange of worthless $49,000 checks between Heavrin and Donoghoe. This is the area in which the Board of Governors adjudged misconduct, and in which I do not concur in its judgment. After reading Heavrin's testimony from the perspective of how things appeared to him at the time each of the successive events took place, I am not convinced that his conduct justifies a mark of Cain that he will have to bear for the rest of his life.

Despite the large record in the bank case (which loses some of its importance with this court's unanimous rejection of the theory that the circuit court judgment forecloses the question of ethical misconduct), there really is not much in the way of conflicting evidence. The facts are virtually undisputed. The one question on which Heavrin and a witness differed is whether he told Miss Collie, at the Citizens Bank, that he had personal knowledge that the endorsements on the $105,000 check were genuine.

She said he did. He denied it. The Board of Governors made no finding on that precise issue. The finding of the Committee was "There was no evidence of any unethical conduct in the cashing of the check."[1]

This is a very critical point to me because if I were convinced that Heavrin did lie to Miss Collie I probably would concur in the majority opinion. I think, however, that a lawyer standing in jeopardy of losing his livelihood and sustaining a permanent blemish on his reputation is entitled to the benefit of any reasonable doubt. Both Miss Collie and Heavrin gave their initial recollections of the conversation more than a year after it had taken place, and by that time each of them had an axe to grind. It was to her interest that she not appear to have been careless, because her employer, the bank, stood to lose $105,000 if found guilty of negligence.[2] And presumably it was in Heavrin's interest to resist any suggestion of intentional wrongdoing. There is no doubt that Heavrin himself believed the endorsements were good. Not only did he guarantee them by adding his own endorsement, but he offered to and did to the best of his knowledge tell the bank, before it honored any checks drawn against the $94,000 deposited by him, where these endorsers could be reached in order that their signatures could be verified. I cannot convict him on the strength of the Collie exchange. Not many people can recall the precise details of past conversations with such Proustian accuracy as the majority of this court seems to ascribe to Miss Collie's version.

Donoghoe had been referred to Heavrin by Frank Haddad, then an official and later president of the Kentucky Bar Association. At this point in time, of course, the real Donoghoe had not been revealed to the

1. It may fairly be inferred, moreover, from Miss Collie's testimony that in clearing the check she was chiefly influenced by the fact that it had been certified.

2. Eventually the circuit court did find the bank negligent and held it liable for $94,000 of the loss, that being the amount still undrawn from

Heavrin's accounts when the bank discovered facts sufficient to put it on notice that one or more of the endorsements had been forged. Miss Collie, of course, was not in any way responsible for the bank's failure to act at that time.

world as it knows him now, serving a sentence in the penitentiary for bilking his clients. He was to all appearances a highly successful damage-suit lawyer. Like most big spenders, he was short on cash and behind in settling his accounts, but ostensibly had plenty of assets. Certainly Heavrin, so far as this record shows, had no reason to and in fact did not doubt his solvency or suspect that he was living in a house of cards that was about to collapse. Heavrin was simply an impressionable young lawyer with less than five years of practice, representing a proven moneymaker with lots of jewelry, big automobiles, and a showy home,[3] who had suddenly fallen into financial straits that must have seemed no more than temporary and accidental. As Heavrin saw it, and justly so, his job as a lawyer was to fight a rear-guard action until Donoghoe could regain his footing.

Donoghoe had collected some money from clients in Pennsylvania, and he said they were letting him borrow some or all of it for 9% interest. He was in arrears in settling with them, and when Heavrin came into the picture they had caused criminal charges to be brought against him. According to Donoghoe, he owed the Pennsylvania people $42,500, but the immediate problem was a $3,000 cold check he had sent them. The check matter was straightened out in short order, but between the Pennsylvania people and other creditors Donoghoe still owed about $44,000 and the Pennsylvanians were pressing for immediate satisfaction of their demands. Meanwhile, Donoghoe assured Heavrin that he was expecting in the near future a fee of $100,000 or more out of a hotel transaction in Owensboro and substantial fees from several other pending cases, including the one in Florida. In order to get the Pennsylvania clients off Donoghoe's back Heavrin under-

took to borrow the necessary money himself, believing of course that Donoghoe would be able to repay it within a short time. First he applied to Bodenbender, who had only $32,500 available to lend, and later he got $10,000 from his stepfather in Atlanta.

Out of the $32,500 borrowed from Bodenbender, $10,000 was used to redeem out of hock some jewelry owned by Donoghoe, including a 10-carat diamond ring insured with Lloyd's of London for $55,000. Heavrin's impression was that the jewelry had a value between $100,000 and $200,000. To secure himself, he drew up and had executed an agreement by which Donoghoe sold him the jewelry for $44,000 subject to a right to repurchase it in 30 days for the same price plus 9% interest. Heavrin applied the remainder of the Bodenbender loan toward Donoghoe's debts, including partial payment of the Pennsylvania claims. Then the Pennsylvania people became importunate for the balance of their money, and this is when Heavrin resorted to his stepfather for the $10,000 loan. Except for an item of $5489 still owing to one Thomas Robertson, the last of the money owed to the Pennsylvania clients was paid out of the $10,000. Donoghoe now owed Heavrin $42,500.

Shortly afterward, as Donoghoe had assured Heavrin would happen, one of the Donoghoe China clippers came sailing home full-laden. On June 6, 1972, a Chicago firm issued a $105,000 check in partial satisfaction of a judgment and settlement he had obtained in Florida incident to a wrongful death action. It was made out to Calvin Young, surviving father of Ray Edward Young, deceased; Donoghoe as administrator of the Ray Edward Young estate; Edgar Addington, surviving father of Carl Addington, deceased; Estill Blair as Ad-

---

**3.** Heavrin's description of Donoghoe: "At that time I was gullible and more or less totally impressed with the guy. The guy had a fantastic house, the best cars money can buy, the biggest cases of anybody I have seen in my life, made more money than I imagined to be on the face of the earth, telephones in his car, a cable address, pilot, adventurer, marine," etc. It is clear that Donoghoe was a con artist of masterful proportions, and was able to take Heavrin in as easily as he had gained the confidence of his own clients.

ministrator of the Carl Addington estate; and Donoghoe and a Florida law firm, their attorneys. Young resided in Raceland, Greenup County, Kentucky, and Addington and Blair lived in Whitesburg, Letcher County, Kentucky, though Heavrin thought they all lived in Whitesburg. In any event, at some time before the check was finally negotiated Donoghoe rented an airplane for the purpose, as Heavrin understood it, of going to Whitesburg to have it endorsed.

On Tuesday, June 13, Heavrin saw Donoghoe off on a plane trip to Miami to see the Florida lawyers, and on that day Donoghoe did in fact give Gilbert Haddad, a member of the Florida firm, a $22,000 check in payment of its share of the attorney-fees. On Thursday, June 15, Donoghoe presented the $105,000 check at the Liberty National Bank, in Louisville, where he had an account. It bore the endorsements of all the payees, though as we now know the endorsements other than Donoghoe's own had been forged by him. The bank declined to negotiate the check unless it was certified. Donoghoe then took a plane to Chicago, had the check certified, and on the next day, Friday, June 16, returned with it to the Liberty Bank. Meanwhile, however, by a rare coincidence Mr. Haddad, the Florida lawyer, had telephoned the Liberty Bank to ask whether the check he had received from Donoghoe was good, had learned during this conversation from Mr. Netherton, an officer of the bank, that Donoghoe was seeking to negotiate the $105,000 check, and had advised the bank that he, Haddad, had never endorsed that check.

In view of this information from Haddad, Mr. Netherton again declined to negotiate the check, but concedes that he did not tell Donoghoe the reason why he would not do so. Heavrin, who accompanied Donoghoe to the bank on Friday, could not understand why the bank would not honor a certified check,[4] and suggested to Donoghoe that they take it over to the Citizens Bank, where Heavrin was a regular customer. Through Miss Collie, as we know, Citizens honored the check, paying Heavrin $11,000 in cash and crediting $49,000 to his personal account and $45,000 to his business account.

Meanwhile, on Thursday the 15th the exchange of worthless $49,000 checks had taken place. On that day Donoghoe gave Heavrin a $49,000 check drawn on the Liberty Bank to cover the $42,500 Heavrin had borrowed and paid out for him plus a fee for Heavrin's services. Heavrin deposited it in his bank account at Citizens, but very shortly thereafter Donoghoe came to Heavrin's office and wanted the check back because his wife had written some other checks that would deplete his bank account.[5] When Heavrin told him he had already deposited the check, Donoghoe asked Heavrin to write him a check in the same amount so that he, Donoghoe, could deposit it. Heavrin complied. On the next day the checks were returned by the respective banks, to no one's loss. Unorthodox as this transaction may have been, there was no intent, on Heavrin's part at least, to injure or defraud anyone, and no injury or fraud resulted from it.

Returning now to Friday, June 16, 1972, the day on which the $105,000 check was negotiated at the Citizens Bank, it is necessary to introduce other background details to facilitate understanding Heavrin's handling of the money. As we have said, he understood that Donoghoe had been to Whitesburg to see the clients there, and he knew he had gone down to Miami to see the Florida lawyers. It was not unreasonable for him to assume that the necessary endorsements on the check had been procured in the course of these visits. Donoghoe had

4. According to Heavrin, the reason given by Netherton was that it was "drawn on uncollected funds."

5. Though Donoghoe did not testify in the bank case or in this proceeding, when he gave Heavrin the $49,000 check he was about to deposit the $105,000, and it might reasonably be surmised that the Liberty Bank's unexpected refusal to credit the $105,000 check to his account was the real reason he came to Heavrin's office to retrieve the $49,000 check.

told him that he had a 50% contingent-fee arrangement with the clients.[6] Heavrin also had the impression from Donoghoe that the $105,000 was part of a settlement that amounted to $175,000 or $180,000, though actually the total was $130,000 (an $80,000 judgment on the Young claim and a $50,000 settlement of the Addington claim).[7]

Heavrin kept an escrow account in the Bank of Louisville, several blocks distant from the main office of the Citizens Bank where the $105,000 transaction took place. In the Citizens Bank he maintained two accounts, a business account for his office transactions (which he called his "legal account") and a personal account for his private or household affairs. When the bank honored the $105,000 check, Heavrin gave Donoghoe $11,000 in cash and deposited $49,000 in the personal account and $45,000 in the office account. At this point it is important to understand that these two deposits in Heavrin's bank accounts at Citizens were made for the sake of temporary convenience, and not through any intent to commingle clients' funds with personal funds. The transaction took place toward the end of banking hours on Friday, June 16, 1972. The Bank of Louisville, where Heavrin kept his escrow account, was several blocks away. Donoghoe was in a hurry, because, as Heavrin understood it, "he was going to drive down or fly down to Whitesburg and pacify the clients and Estill Blair . . . who knew all the families and who was the executor of one of the estates. Mr. Blair had been in Louisville either a day or two days before that to get money out of the settlement for the purpose of paying immediate bills that were pressing down on these people, and Donoghoe's comment was that out of a case where he had earned 80

some-odd thousand dollars . . . he had gotten to keep $1,000. He was going to keep $1,000 and take $10,000 to those people."

According to Heavrin, Blair had come to town very shortly after Donoghoe received the $105,000 check, "and it had taken such a long time to get the money after the settlement of this case that the people down there were committed on some financial obligations that had to be met, and they were not particularly anxious to have to wait for a check to be deposited and clear the bank, and so Blair came up to Louisville to get cash to satisfy their immediate financial needs. That was one of the things he [Donoghoe] objected to when I asked him to have the check certified. He objected because Blair was in Louisville and he wanted the money. So he apparently worked out some arrangement where Blair went back to Whitesburg and the agreement seemed to be that he would then personally deliver the money down there to those people."

So much for the $11,000 in cash. The two bank accounts at Citizens were utilized merely as conduits for the remaining $94,000. The $45,000 deposited in the office account was promptly checked out and deposited in his escrow account at the Bank of Louisville for use in paying off Donoghoe's accounts, including what he owed Heavrin.[8] In other words, Heavrin received $45,000 for the purpose of satisfying the outstanding claims against Donoghoe, which he proceeded to do, through checks drawn on his escrow account. The other $49,000 was for Donoghoe to distribute to his clients, and was deposited in Heavrin's personal account so that Heavrin could give Donoghoe a check instead of $49,000 in cash. Accord-

---

6. In fact, it was a 40% contract.

7. Unbeknownst to Heavrin, Donoghoe had previously received and forged the endorsement of Calvin Young on a $20,000 check made out to him and Young. The remaining $5,000 had already been paid in the form of still another check, which is not involved here.

8. One payment out of this fund was a $569.50 check to Donoghoe, which Heavrin explained was to reimburse him for the amount of a miscalculation in computing the total of outstanding debts.

ingly, Heavrin drew a check to Donoghoe for $48,958 that same afternoon.[9]

To summarize the transaction at Citizens Bank on June 16, out of the $105,000 check Donoghoe got (in round figures) $60,000, $11,000 of which was cash and $48,958 was in the form of a check from Heavrin, and the remaining $45,000 was processed through Heavrin's personal account at Citizens Bank into his escrow account at the Bank of Louisville. Heavrin proceeded to disburse the $45,000 as agreed, and Donoghoe, presumably, made off with the $60,000. Heavrin's explanation for having placed the money in two different bank accounts at Citizens was to the effect that he wanted to keep the money he was going to disburse, and for which he regarded himself as accountable, separate from the money going directly to Donoghoe.

There are a few knots and kinks in the factual picture of this case that this writer has not been able to unravel. For example, there is the $42 difference between the $49,000 deposited in Heavrin's personal account and the $48,958 he checked out of it to Donoghoe. That it was later reimbursed to Donoghoe as a part of the $569.50 drawn by Heavrin on his escrow account was brought out in the testimony, but why the difference in the first place is one of those little mysteries to which the lawyers in the case apparently knew the answer already and did not attempt to get into the record. Nevertheless, neither this particular hiatus nor any of the other unanswered puzzles inhering in the record provide any supportive basis for the charges of ethical misconduct against Heavrin.

At this point, it ought to be brought to the reader's attention that the formal charges initiated against Heavrin by the Inquiry Tribunal contained no reference whatever to the Canons or Disciplinary Rules but alleged facts only. The rules and principles alleged to have been violated were selected at the end rather than the

beginning of the process, both figuratively and literally as an afterthought. Somewhat in the style of Alice's Queen of Hearts, the Board evidently convicted Heavrin first and then decided what it had convicted him for. This may comport with due process, but it makes me think that perhaps Heavrin has been right all along in insisting that from the beginning the charges were never sufficient.

The KBA Board of Directors concluded that Heavrin's conduct with respect to the $105,000 check violated DR 1–102(A)(4), which provides that a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation. Except for the alleged misrepresentation to Miss Collie, concerning which I do not believe the evidence is sufficient to justify a finding of guilt, it is very clear to me that there is no basis whatever for condemning Heavrin under this rule, which is directed at intentional or wilful misconduct as distinct from negligence or bad judgment.

The next respect in which the Board found Heavrin guilty was that he violated DR 9–102(A) "relative to the separation of funds. No amount of check manipulating . . . as went on in this case can be justified under the circumstances which are evident when the entire facts are documented." This finding shakes me to the very foundation, because it could only have resulted from a failure to study this record thoroughly and then to think about it long enough. Even one complete reading of the evidence would not bring to a lawyer of average mentality (at least this one) a sufficient grasp of the details to mount a fair perspective. Heavrin himself, for example, testified at length on three different occasions, and one must go back and forth among these three transcripts in order to fill in the gaps and fit the pieces together. The process of gathering, collating, arranging and compressing the pertinent evidence into the simple narrative set forth in this

**9.** This $42 difference between the $49,000 deposit and the $48,958 check was reimbursed to

Donoghoe in the $569.50 check mentioned in footnote 8.

dissenting opinion certainly has consumed more of the writer's time than might appear at first blush.

DR 9–102(A) condemns the mingling of a lawyer's funds with those of his client. No one has cited any authority for the proposition that it cannot be done with the knowledge and consent of the client. The client in this instance was Donoghoe. Everything that was done was with his knowledge and for his convenience and, to the extent that any "commingling" occurred, it was done in his very presence and under his supervision. But even if that were not a sufficient answer to the charge of commingling, there was no real commingling here anyway. $49,000 was put into one of Heavrin's accounts so that he could give Donoghoe a check instead of cash. The other $45,000 was put in his office account so that he could write a check to his escrow account in another bank and then distribute the money as directed by his client, which he did. Except for the insignificant $42 mentioned earlier ·in this opinion, the deposit and transfer of these funds were completed almost contemporaneously. None of the money remained in either of Heavrin's private accounts long enough to get warm, much less to find a new home. I cannot believe the members of the Board thought this through.

The last references by the Board to specific rule-violations are that Heavrin's conduct "constituted a reckless disregard for the rights of the payees on the checks [sic] in question and is a violation not only of Canon 9 of the Code of Ethics in regard to Trust Funds, but also DR 1–102."

Both Canon 9 and DR 1–102 cover a good deal of territory. Canon 9 says, "A lawyer Should Avoid Even the Appearance of Professional Impropriety." The Ethical Considerations and Disciplinary Rules following Canon 9 all provide specific applications of that broad precept. Except for the matter of commingling funds, which I have already discussed, none of them comes close to this case. DR 1–102 declares it misconduct to

(1) violate a Disciplinary Rule (2) circumvent a Disciplinary Rule, (3) engage in illegal conduct involving moral turpitude, (4) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, (5) engage in conduct that is prejudicial to the administration of justice, or (6) engage in any other conduct that adversely reflects on his fitness to practice law. Thus far, I do not see that Heavrin violated or circumvented any of the Disciplinary Rules mentioned by the Board, and I do not believe anyone involved in this proceeding would claim that he engaged in illegal conduct. If he did, apparently the grand jury of Jefferson County never got word of it. Item (4), as I have suggested before, refers to intentional deceit. Item (5) pertains to the administration of justice and obviously can have no application to this case. Only Item (6), "conduct that adversely reflects on his fitness to practice law," could possibly be argued as appropriate to the charge that Heavrin disregarded the rights of the payees of the $105,000 check.

Some years ago, in *Kentucky State Bar Association v. Taylor,* Ky., 482 S.W.2d 574, 582 (1972), we made the following observation: "If the canons of ethics adopted for the legal profession were tested under the 'void for vagueness' doctrine which has spelled the doom of various breach of peace and disorderly conduct laws throughout the country it is doubtful that they would survive this case." I repeat that observation here. Although this is not a criminal case, and the principles of constitutional law applicable to criminal cases are not entirely applicable here, the right to engage in a professional practice, once earned, is a right of great value, and its loss by revocation or suspension is nearly as serious a punishment as a criminal conviction and sentence. Without attempting to research and write a law-review article on the subject, I think the due-process rights of a respondent in a disciplinary proceeding which may result in the loss or suspension of his license to practice can be no different from those of a defendant in a criminal case. In fine, the

law under which he is being tried must be clear, and the charge must be specific. In this proceeding neither of those requirements has been satisfied.

"Conduct that adversely reflects on his fitness to practice law." By what standard? And more importantly, by whose standard? The answer is unavoidable—the subjective standard of whoever happens to be doing the judging. So far as I am concerned, that cannot be the law in a civilized society—not in this country, anyway.

Assuming, however, that I am wrong in holding the opinion that this undefined standard of conduct, uncoupled with some other more specific violation, cannot be a valid basis for disciplinary action, let us take one last look at the culpability, vel non, of Heavrin's conduct toward Donoghoe's clients.

The first thing that must be remembered is that he believed Donoghoe and trusted Donoghoe.[10] He thought Donoghoe had 50% of the money coming to him as a fee.[11] The $60,000 turned over to Donoghoe was ample to satisfy his clients.[12] The endorsements on the check, which Heavrin assumed to be genuine, gave witness that the clients trusted Donoghoe with the proceeds of the check. Indeed, had Heavrin merely given Donoghoe the whole $105,000 in cash, this proceeding would never have arisen. As it is, he took care to see that out of the share of the money he thought was Donoghoe's, Donoghoe paid his debts. It just did not occur to him that Donoghoe, with what Heavrin thought to be enough money to settle with his clients, would not do so.

Gullible, yes. Careless, probably. Moral turpitude, no. Suspension from practice,

emphatically no. I simply feel that my obligation as a judge compels me to protest this result.

CLAYTON, J., concurs in this dissent.

---

10. It is interesting to note that at one point during the course of getting the $105,000 check negotiated Heavrin actually thought about calling Mr. Blair in Whitesburg to make sure it was all right, but changed his mind out of a feeling of guilt for mistrusting Donoghoe, who, as Heavrin put it, had never lied to him.

11. At that time we had not yet decided *First Nat'l Bank of Louisville v. Progressive Cas. Ins. Co.*, Ky., 517 S.W.2d 226, 230 (1975), holding

that an attorney has no proprietary interest in money collected for his client until he has delivered it over to the client. (That case arose out of another of Donoghoe's criminal excursions.)

12. The $45,000 payment to Heavrin also operated to redeem Donoghoe's jewelry, which now became un unencumbered asset of considerable value.